**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| PETER BARTOK, derivatively on behalf of NEXT BRIDGE HYDROCARBONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GREGORY MCCABE, JOHN BRDA, ROBERT L. COOK, CLIFTON DUBOSE, JR., JOSEPH DEWOODY, LUCAS T. HAWKINS, DELVINA OELKERS, MIA PITTS, and KRISTIN WHITLEY, <br><br><br> Defendants, <br><br> and <br><br> NEXT BRIDGE HYDROCARBONS, INC., <br><br> Nominal Defendant. | Case No: 7:26-cv-00096 <br><br> **JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Peter Bartok ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Next Bridge Hydrocarbons, Inc. ("Next Bridge" or the "Company"), files this Verified Stockholder Derivative Complaint against Defendants Gregory McCabe ("McCabe"), John Brda ("Brda"), Robert L. Cook ("Cook"), Clifton DuBose, Jr. ("DuBose"), Joseph DeWoody ("DeWoody"), Lucas T. Hawkins ("Hawkins"), Delvina Oelkers ("Oelkers"), Mia Pitts ("Pitts"), and Kristin Whitley ("Whitley") (collectively, the "Individual Defendants," and together with Next Bridge, the "Defendants") for the Individual Defendants' breaches of fiduciary duties as current and/or former directors and/or officers of the Company, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and against Defendants Brda, Cook, McCabe,

1

DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Next Bridge and Meta Materials Inc. ("Meta Materials"), legal filings, news reports, securities analysts' reports and advisories about the Company and Meta Materials, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a stockholder derivative action that seeks to remedy wrongdoing committed by Next Bridge's officers and directors in connection with the Company's spin-off from Meta Materials, Inc. ("Meta Materials") on or around December 14, 2022.

2.    Next Bridge was incorporated in Nevada on August 31, 2021 as OilCo Holdings, Inc. At that time, Next Bridge was a wholly owned subsidiary of Meta Materials. On June 30, 2022, the Company changed its named from OilCo Holdings, Inc. to Next Bridge.

3.    Today, Next Bridge is based in Midland, Texas and is an independent public reporting energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Next Bridge's primary focus has been the development of interests in an oil and gas project consisting of 134,000 contiguous gross acres the Company owns in the Orogrande Basin located in Hudspeth County, Texas (the "Orogrande Project"). Next Bridge has additional minor interests located in the eastern portion of

2

the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in Oklahoma (the "Oklahoma Wells").

4.    In 1984, Defendant McCabe founded the McCabe Petroleum Corporation ("MPC"). He subsequently also founded the Hudspeth Oil Corporation ("Hudspeth").

5.    In 2010, Torchlight Energy Resources, Inc. ("Torchlight") began oil and gas drilling operations. Torchlight described itself as "focus[ed] on drilling and working interest programs within the United States that have a short window of payback, a high internal rate of return and proven and bookable reserves. We currently have only one interest in an oil and gas project, the Marcelina Creek Field Development . . .. We anticipate being involved in multiple other oil and gas projects moving forward, pending adequate funding."

6.    On August 7, 2014, Torchlight, MPC, and Hudspeth entered into a Purchase Agreement that covers drilling leases for the 134,000 contiguous gross acres of the Orogrande Project. Defendant McCabe also owns a controlling interest in Wolfbone Investments, LLC ("Wolfbone"). Wolfbone owns certain properties in the Orogrande Project. Additionally, Defendant McCabe owns a controlling interest in Magdalena Royalties, LLC ("Magdalena"), an entity that holds a 4.5% overriding royalty interest in the acreage of the Orogrande Project.

7.    On April 4, 2016, a subsidiary of Torchlight, Torchlight Energy, Inc. ("TEI") acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin for the Hazel Project.

8.    On August 13, 2020, TEI and another subsidiary of Torchlight, Torchlight Hazel, LLC, entered into an option agreement with Masterson Hazel Partners, LP ("MHP"), an entity that Defendant DuBose controls through his role as CEO of MHP's General Partner, Masterson Hazel Management, LLC, and MPC. Under the option agreement, MHP was obligated to satisfy certain

3

drilling obligations on the Hazel Project. Further, under the terms of the option agreement (which was amended in September 2020), MHP had the option to purchase the entire Hazel Project no later than May 31, 2021.

9.      Between May and August of 2020, Torchlight engaged in discussions with five businesses that were interested in pursuing a reverse merger. All five merger discussions were unsuccessful because of Torchlight's disposition or sale of its oil and gas assets before any merger or because of disagreements regarding the proper valuation of the merging entity.

10.      In early September 2020, Torchlight's investor relations representative, who had been tasked with facilitating Torchlight's merger discussions, initiated a virtual meeting between Torchlight's management and George Palikaras ("Palikaras"), who was the President and CEO of Metamaterial Inc. ("Metamaterial"), a privately held Canadian corporation headquartered in Nova Scotia, Canada.

11.      However, the issues that scuttled Torchlight's five previous merger discussions haunted Torchlight in the merger discussions with Metamaterial as well. In particular, problems arose pertaining to "[Metamaterial's] desire that Torchlight divest the O&G Assets [oil and gas assets], the anticipated impact of that divestiture on Torchlight's market capitalization prior to closing the transaction (which the parties were using to determine Torchlight's valuation), the appropriate method for valuing the O&G Assets, and how the value of the O&G Assets should be allocated between each party's legacy stockholder base."

12.      To resolve this issue, Metamaterial suggested that the parties structure the merger so that all the O&G Assets would be allocated to legacy Torchlight stockholders, and on that basis agree on the pro forma ownership percentage of the combined company (Meta Materials) that would be allocated to each of Metamaterial's stockholder base and Torchlight's stockholder base.

4

Torchlight and Metamaterials eventually agreed that Torchlight's legacy stockholder base would own approximately 75% of Meta Materials and Metamaterial's legacy stockholder base would own approximately 25% of Meta Materials.

13.    On December 14, 2020, Torchlight[1] and its subsidiaries, Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc., "Exchangeco") and 2798831 Ontario Inc. ("Callco"), both Canadian corporations, entered into an arrangement agreement (the "Arrangement Agreement") with Metamaterial, to acquire all of the outstanding common shares of Metamaterial by way of a statutory plan of arrangement (the "Arrangement") under the Ontario Business Corporations Act, on and subject to the terms and conditions of the Arrangement Agreement.

14.    On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed and the combined company was named Meta Materials. Meta Materials stock began trading on the NASDAQ.

15.    Under the Arrangement, Meta Materials declared a stock dividend, on a one-for-one basis, of shares of Meta Materials Series A Non-Voting Preferred Stock (the "Meta Materials Series A Preferred Stock") to holders of legacy Torchlight's common stock as of June 24, 2021. By dint of the Arrangement, the holders of Meta Materials Series A Preferred Stock were entitled to receive certain stock dividends based on the net proceeds of the sale of any O&G Assets and

---

[1] Previously, Meta Materials was in the energy business, particularly when Meta Materials was known as Torchlight. However, since at least June 2023, Meta Materials has revised its business model by largely abandoning the energy business and instead focused on becoming a "advanced materials and nanotechnology company" that develops technology to "enable global brands to develop new products to improve performance for customers in aerospace and defense, consumer electronics, 5G communications, batteries, authentication, automotive and clean energy" including applications relating to "authentication, wide area motion imagery, battery materials, and transparent conductive films." March 28, 2024 Meta Materials Form 10-K Annual Report for the fiscal year ending December 31, 2023.

were also entitled to possibly receive a pro rata dividend of equity in a spin-off entity to which Meta Materials would transfer any remaining O&G Assets.

16.    As such, Plaintiff held Meta Materials Series A Preferred Stock. This Verified Stockholder Derivative Complaint arises from the Board of Directors of Meta Materials failing to timely sell off the O&G Assets so that option (b)—creating separate entities, spinning them off, and providing Meta Materials Series A Preferred Stockholders equity interests in those spun-off entities—was the only option for the Board of Directors of Meta Materials.

17.    To this end, on July 14, 2022, Next Bridge filed with the SEC a registration statement on Form S-1 seeking to spin-off Next Bridge from Meta Materials. The initially filed registration statement underwent several amendments, including the inclusion of a prospectus filed on Form 424B4 on November 18, 2022 (the "Prospectus," and together with the subsequently amended registration statement, the "Registration Statement").

18.    Slightly less than one month later, on December 14, 2022, Meta Materials distributed 100% of the outstanding shares of capital stock of Next Bridge—165,472,241 shares of Next Bridge common stock—to Meta Materials Series A Preferred Stockholders, thereby separating Next Bridge from Meta Materials and completing the spin-off (the "Spin-Off"). After that date, Next Bridge was an independent public reporting company.

19.    After the Spin-Off, Defendant DuBose became Next Bridge's CEO and Chairman of the Board of Directors (the "Board"), Defendant DeWoody became the President and a Company director, Defendant Hawkins became the Chief Financial Officer ("CFO"), Defendant Oelkers became the Chief Operating Officer ("COO"), and Defendants Cook, Pitts, and Whitley became Company directors.

20.    Meta Materials, the former parent company of Next Bridge, continuously monitored the value of the O&G Assets before the Spin-Off.

21.    Yet, the Registration Statement contained astronomically high valuations of the worth of Next Bridge's O&G Assets. In particular, the Registration Statement represented that Next Bridge's O&G Assets were worth $45.6 million as of December 31, 2021, $46.7 million as of March 31, 2022, and $47.3 million as of September 30, 2022.

22.    Unbeknownst to investors, the public, and the future shareholders of Next Bridge, the O&G Assets were effectively worthless. In subsequent financial filings, Meta Materials reported that the value of the O&G Assets as of the date of the Spin-Off was "not substantive" and therefore increased its reserves on notes payable by Next Bridge to Meta Materials that had historically been secured by the O&G Assets.

23.    Making matters worse, the Registration Statement failed to disclose that Defendant DuBose—as CEO of MHP's General Partner, Masterson Hazel Management, LLC—was materially interested in the transactions related to the Spin-Off.

24.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Next Bridge's O&G Assets which the Company received from Meta Materials in the Spin-Off were not worth tens of millions of dollars but were actually substantively worthless; (2) Next Bridge's predecessor parent company, Meta Materials, enjoyed full access to relevant valuation information for the O&G Assets and had continuously monitored the value of the O&G Assets yet failed to

7

disclose that the O&G Assets were worthless; (3) Defendant DuBose was materially interested in the Spin-Off through his role as CEO of Masterson Hazel Management, LLC, the General Partner of MHP; (4) the internal controls of Meta Materials and Next Bridge were materially inadequate and ineffective; (5) as a result, Next Bridge was not nearly as valuable as the Individual Defendants claimed Next Bridge to be; and (6) as a further result, Meta Materials Series A Preferred Stockholders were receiving a worthless company in the Spin-Off. As a result of the foregoing, Next Bridge's public statements were materially false and misleading at all relevant times.

25.    The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

26.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

27.    In light of the Individual Defendants' misconduct, which has subjected the Company and ten current and former officers, executives, and directors to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Texas, presently on appeal, captioned *Targgart v. Next Bridge Hydrocarbons, Inc., et al.*, Case No. 4:24-CV-00767-P (the "Securities Class Action"),[2] the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual

---

[2] On July 3, 2025, the Court dismissed the Amended Complaint in the Securities Class Action based on the conclusion that, due to the complicated nature of the Spin-Off, the plaintiffs did not have "statutory coverage" to pursue claims under the Securities Act, and therefore did not reach the merits of the plaintiffs' arguments in the Securities Class Action. The plaintiffs in the Securities Class Action are presently appealing the Court's decision to dismiss the Amended Complaint in the United States Court of Appeals for the Fifth Circuit.

Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

28.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

30.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. §1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

33.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

9

or he or she is an individual who is a citizen of Texas or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

34.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

35.     Plaintiff is a current stockholder of Next Bridge. Plaintiff continuously owned Meta Materials Preferred Stock from October 13, 2022 until it was converted to Next Bridge common stock through the Spin-Off, and he has continuously owned Next Bridge common stock since the Spin-Off.

36.     Plaintiff is a citizen of California.

### Nominal Defendant Next Bridge

37.     Next Bridge is a Nevada corporation with its principal executive offices located at 500 W. Texas Ave., Suite 890, Midland, Texas 79701. Next Bridge's common stock is not publicly traded.

### Defendant McCabe

38.     Defendant McCabe has served as the Chairman of the Board since June 21, 2023 and as President and CEO since January 15, 2024. Previously, Defendant McCabe served as the President and Chairman of Torchlight from October 2016 until Torchlight merged with Metamaterials on June 28, 2021. Defendant McCabe founded MPC and Hudspeth, entities that own leases and have drilling rights in the Orogrande Project. Defendant McCabe also owns a controlling interest in Wolfbone, an LLC that owns certain properties in the Orogrande Project.

10

Additionally, Defendant McCabe owns a controlling interest in Magdalena, an LLC that holds a 4.5% overriding royalty interest in the acreage of the Orogrande Project. Defendant McCabe has also entered into related transactions with Defendant DuBose through the agreements entered into between MPC and MHP pertaining to the Hazel Project (Defendant DuBose serves as the CEO of Masterson Hazel Management, LLC which is the General Partner of MHP). Defendant McCabe is a defendant in the Securities Class Action.

39.    The Company's annual report filed on Form 10-K with the SEC on December 11, 2025 (the "2024 Next Bridge Form 10-K) stated the following about Defendant McCabe:

> Gregory McCabe has served as Chair of the Board of NBH since June 2023 and has served as Chief Executive Officer of the Company since January 2024. Since March 1988, Mr. McCabe has owned and served as the President of McCabe Petroleum Corporation, a private corporation that offers petroleum refining, and since April 2013, he has owned and served as president of McCabe Ventures, LLC, a multifaceted private investment company with a focus on oil and gas, real estate, and other investments. From July 2016 until June 2021, Mr. McCabe served as the chief executive officer of Torchlight Energy Resources, Inc., the Company's predecessor. Mr. McCabe has active ownership in several other oil and gas entities including Manix Royalty, Texas Rock Oil, TRO-X, and McCabe Minerals and Royalties. Working with geologist, Rich Masterson, Mr. McCabe was extremely active in the early development of the Wolfbone play in the Delaware Basin portion of the Permian Basin. The experience and knowledge learned in the Wolfbone play helped formulate Mr. McCabe and Mr. Masterson's theories and concepts regarding the Orogrande Basin. In addition to his work in the Orogrande and Delaware Basins of Texas and New Mexico, Mr. McCabe has explored for oil and gas throughout the U.S., including Louisiana, Utah, Arizona, Montana, and Nebraska. Mr. McCabe has been involved in numerous oil and gas ventures throughout his career and has a vast experience in technical evaluation, operations and acquisitions and divestitures. Mr. McCabe received his Bachelor of Science degree in Geology in 1984 from Sul Ross State University.

40.    Upon information and belief, Defendant McCabe is a citizen of Texas.

**Defendant Brda**

11

41.     Defendant Brda served as Torchlight's CEO from 2014 until its merger with Metamaterial. After the merger with Metamaterial, Defendant Brda held a consulting role with Meta Materials until late 2022. Defendant Brda is a defendant in the Securities Class Action.

42.     Upon information and belief, Defendant Brda is a citizen of Missouri.

**Defendant Cook**

43.     Defendant Cook has served as a Company director since the Company initially filed the Registration Statement in November 2022. Additionally, Defendant Cook, along with Defendants Rice, signed the Registration Statement. Defendant Cook is a defendant in the Securities Class Action.

44.     The 2024 Next Bridge Form 10-K the following about Defendant Cook:

Robert Lance Cook has served as a director of the Company since December 2022. Mr. Cook has spent 36 years at Shell Oil with final positions of Vice President of Wells Technology and Chief Scientist. Mr. Cook has extensive experience in Deepwater, Arctic, and Unconventional Research & Development and Operations. Mr. Cook is the founder and CEO of Enventure Global Technology, a joint venture between Shell and Halliburton. Mr. Cook has served as the COO of Sirius Well Manufacturing, a joint venture between Shell and CNPC and is a technologist with an extensive patent portfolio. Since retiring from Shell in 2016, Mr. Cook has served as Vice President of Production Operations for WellsX Inc. from 2017 to 2020 and in 2020, he founded and continues to serves as president and chief technology officer of Sage Geosystems Inc.

45.     Upon information and belief, Defendant Cook is a citizen of Utah.

**Defendant DuBose**

46.     Defendant DuBose served as Chairman of the Board and CEO of the Company from the Spin-Off on December 14, 2022 until he resigned on January 15, 2024. Before the Spin-Off, Defendant DuBose was an employee of Hudspeth, a subsidiary of Next Bridge owned and controlled by Defendant McCabe. Defendant DuBose is a defendant in the Securities Class Action.

47.    The Company's amendment to its annual report filed on Form 10-K with the SEC on May 1, 2023 (the "2022 Next Bridge Form 10-K") stated the following about Defendant DuBose:

Clifton DuBose, Jr. has successfully acquired, managed, and/or sold thousands of royalty acres and non-operated working interests in the Permian Basin. Since May 2018, Mr. DuBose has served as co-founder and member of Valor Mineral Management LLC ("Valor"). Valor is a mineral and working interest management firm which uses a proprietary software platform it has developed, known as "mineral.tech." Since August 2016, Mr. DuBose has also served as President of Imperial Royalty Management I, LLC, which is the general partner of a company that owns certain mineral interests, and since August 2016 as the managing member of Korban Resources LLC, a company which invests in oil and gas interests. Mr. DuBose is also an attorney, licensed to practice law in the State of Texas. He earned his law degree from Georgetown Law, in Washington D.C.in 2009 and a BS in Agribusiness from Abilene Christian University in 2004.

48.    Upon information and belief, Defendant DuBose is a citizen of Texas.

**Defendant DeWoody**

49.    Defendant DeWoody served as a Company director and as the President of Next Bridge from the Spin-Off on December 14, 2022 until he resigned on June 30, 2023. Before the Spin-Off, Defendant DeWoody was an employee of Hudspeth, a subsidiary of Next Bridge owned and controlled by Defendant McCabe. Defendant DeWoody is a defendant in the Securities Class Action.

50.    The 2022 Next Bridge Form 10-K stated the following about Defendant DeWoody:

Joseph DeWoody has served as the founder and partner of several successful minerals-rights companies, including Clear Fork Royalty, since April 2010, and Valor since May 2018. Mr. DeWoody implemented strategic initiatives at Valor, managing 80,000 oil and gas interests in over 2,000,000 gross acres across 32 States, with strong revenue growth since inception developing full P&L, strategy, and business operations. He also developed Valor's proprietary mineral and working interest management software, known as "mineral.tech." Mr. DeWoody has also structured and participated in multiple complex transactions in both operated and non-operated assets. He has managed reporting to partners, including quarterly compilations, annual audit, and contractual calculations and payments. Mr. DeWoody was the 2021 D CEO Energy Services and Technology Executive

13

of the Year and is a life member of American Mensa. He received his BBA and MBA from Baylor University, where he played football. He was appointed to the Texas Board of Professional Geoscientists, and he serves as director of the National Association of Royalty Owners—Texas. He was named one of Oil and Gas Investor Magazine's "Top 20 Under 40" and was featured in the Dallas Business Journal's "Who's Who in Energy."

51.     Upon information and belief, Defendant DeWoody is a citizen of Texas.

**Defendant Hawkins**

52.     Defendant Hawkins served as the CFO of the Company from December 14, 2022 until he resigned on January 15, 2024. Defendant Hawkins is a defendant in the Securities Class Action.

53.     The 2022 Next Bridge Form 10-K stated the following about Defendant Hawkins:

Lucas T. Hawkins is the Co-Founder and has served as Chief Financial Officer of Mammoth Exploration LLC, a private equity backed upstream oil and gas company, since June 2016. Since July 2013, Mr. Hawkins has served as VP—Business Development of Hawkins Exploration, Inc. ("HEI"). HEI is an independently owned oil and gas exploration company focused on the Permian Basin. Mr. Hawkins led, managed and executed numerous acquisitions and subsequent development of oil and gas properties across the Permian Basin. From 2010 to 2011, Mr. Hawkins served as an Associate with The Sterling Group, a middle market private equity group focusing on industrial, manufacturing and distribution businesses. From 2011 to 2013 Mr. Hawkins served as an Associate with Natural Gas Partners, an energy private equity firm. Mr. Hawkins has a background in energy investment banking and private equity and earned his BBA in Finance and Business Honors from the University of Texas at Austin.

54.     Upon information and belief, Defendant Hawkins is a citizen of Texas.

**Defendant Oelkers**

55.     Defendant Oelkers served as the COO of the Company from December 14, 2022 until she resigned on March 27, 2024. Before the Spin-Off, Defendant Oelkers was an employee of Hudspeth, a subsidiary of Next Bridge owned and controlled by Defendant McCabe. Defendant Oelkers is a defendant in the Securities Class Action.

56.     The 2022 Next Bridge Form 10-K stated the following about Defendant Oelkers:

14

Delvina Oelkers served as Asset Manager from March 2016 to March 2019 at Eclipse Resources and as Completions Manager from March 2019 to November 2020 at Montage Resources, in each position where she managed engineering teams, achieving cost and efficiency improvements while implementing innovative technology for substantial reserve recovery. She led her operations team through several successful M&A transactions. Ms. Oelkers designed completions for the Eclipse and Montage Resources Super Lateral Program, including the design and execution of the first world-record-setting "Purple Hayes 1H" Well. As an Asset Manager at Eclipse Resources, Ms. Oelkers was responsible for leading the multidisciplinary team to prove-up the asset. By utilizing innovative technologies in design, the first exploratory well produced 35% higher than type curve.

57.     Upon information and belief, Defendant Oelkers is a citizen of Texas.

**Defendant Pitts**

58.     Defendant Pitts served as a Company director from the Spin-Off on December 14, 2022 until she resigned on March 12, 2024. Defendant Pitts is a defendant in the Securities Class Action.

59.     The 2022 Next Bridge Form 10-K stated the following about Defendant Pitts:

Mia Pitts, age 39, is currently serving as Chief Privacy Officer, US & Canada at Marsh McLennan Companies ("Marsh") after serving as Senior Counsel, Privacy and Digital at Marsh from February 2018 until March 2023. Ms. Pitts previously was a litigator and regulatory compliance lawyer at Freshfields Bruckhaus Deringer (March 2010- March 2016), one of the world's largest and oldest law firms. Ms. Pitts has represented corporate and individual clients in internal, regulatory, civil, and criminal investigations before the U.S. Security and Exchange Commission, Department of Justice, and state attorney generals as well as in shareholder securities litigation, class action litigations, and other private civil allegations and suits. She has also represented independent corporate oversight authorities appointed by the federal government, including the DOJ-appointed monitor of a global financial institution and the federal court-appointed receiver of a multi-national firm in an SEC securities fraud matter. Ms. Pitts graduated from Georgetown University Law Center and Barnard College of Columbia University.

60.     Upon information and belief, Defendant Pitts is a citizen of Texas.

**Defendant Whitley**

15

61.     Defendant Whitley served as a Company director and the Chairperson of the Audit Committee from the Spin-Off on December 14, 2022 until she resigned on March 21, 2024. Defendant Whitley is a defendant in the Securities Class Action.

62.     The 2022 Next Bridge Form 10-K stated the following about Defendant Whitley:

Kristin Whitley, CPA, age 39, began her career in June 2006 as a public accounting with Whitley Penn where she worked for 10 years. While at Whitley Penn she served a variety of clients within the energy and mining industries. In August 2016, Mrs. Whitley joined Vista Minerals, a leading in-basin regional provider of sand to industrial, oil and gas companies, in the role of Chief Accounting Officer and less than a year later was named Chief Financial Officer. While at Vista Minerals, Mrs. Whitley has managed the finance and accounting, human resources, and information technology functions, participating in numerous capital raises, strategic initiatives, contract negotiations, and risk management exercises. Mrs. Whitley is a Certified Public Accountant in the State of Texas. She graduated from The University of Texas at Austin with her BBA and from Texas Christian University's Neeley School of Business with her MBA. In 2019, Mrs. Whitley was named one of Oil and Gas Investor's Forty Under 40 in Energy.

63.     Upon information and belief, Defendant Whitley is a citizen of Texas.

**<u>FIDUCIARY DUTIES OF THE DEFENDANTS</u>**

64.     By reason of their positions as officers, directors, and/or fiduciaries of Next Bridge and because of their ability to control the business and corporate affairs of Next Bridge, the Individual Defendants owed Next Bridge and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Next Bridge in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Next Bridge and its shareholders so as to benefit all shareholders equally.

65.     Each director and officer of the Company owes to Next Bridge and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Next Bridge, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67. To discharge their duties, the officers and directors of Next Bridge were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Next Bridge, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Next Bridge's Board at all relevant times.

69. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination

17

of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

70.    To discharge their duties, the officers and directors of Next Bridge were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Next Bridge were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Texas, and the United States, and pursuant to Next Bridge's own Code of Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Next Bridge conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Next Bridge and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Next Bridge's operations would comply with all applicable laws and Next Bridge's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.    Each of the Individual Defendants further owed to Next Bridge and the stockholders the duty of loyalty requiring that each favor Next Bridge's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Next Bridge and were at all times acting within the course and scope of such agency.

73.    Because of their advisory, executive, managerial, and directorial positions with Next Bridge, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Next Bridge.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

75.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

77.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Next Bridge was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

20

78.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Next Bridge and was at all times acting within the course and scope of such agency.

## NEXT BRIDGE'S CODE OF CONDUCT

80.     Next Bridge's Code of Conduct states the following with respect to its policy objectives:

This Code of Conduct (this "Code") covers a wide range of business practices and procedures. It does not cover every issue that may arise, but it sets out basic principles to guide the directors, officers, and employees of Next Bridge Hydrocarbons, Inc. (the "Company"). All Company directors, officers, and employees should conduct themselves accordingly and seek to avoid even the appearance of improper behavior in any way relating to the Company. In appropriate circumstances, this Code shall also be provided to and followed by the Company's agents and representatives, including consultants.

Any director or officer who has any questions about this Code should consult with the Company's chief executive officer, the chief financial officer, or legal counsel as appropriate in the circumstances. If an employee has any questions about this Code, the employee is encouraged to ask his or her supervisor, manager or other appropriate Company personnel for further guidance relating to provisions of this Code, or specific situation(s) governed by this Code.

81.     The Code of Conduct's scope is defined as follows:

This Code is intended to deter wrongdoing and to promote the following:
   • honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
   • full, fair, accurate, timely, and understandable disclosure in reports and documents the Company files with, or submits to, the U.S. Securities and

21

Exchange Commission (the "SEC") and in other communications made by the Company;
• compliance with applicable governmental laws, rules, and regulations;
• the prompt internal reporting of violations of this Code to the appropriate person or persons identified in this Code;
• accountability for adherence to this Code; and
• adherence to a high standard of business ethics.

82.    In a section titled, "Compliance with Laws, Rules and Regulations," the Code of

Conduct states the following:

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All directors, officers, and employees of the Company should respect and obey all laws, rules and regulations applicable to the business and operations of the Company. Although directors, officers, and employees are not expected to know all of the details of these laws, rules, and regulations, it is important to know enough to determine when to seek advice from supervisors, managers, officers or other appropriate Company personnel.

83.    In a section titled, "Conflicts of Interest," the Code of Conduct states the following,

in relevant part:

A "conflict of interest" exists when an individual's private interest interferes in any way – or even appears to conflict – with the interests of the Company. A conflict of interest situation can arise when a director, officer, or employee takes actions or has interests that may make it difficult to perform his or her work on behalf of the Company in an objective and effective manner. Conflicts of interest may also arise when a director, officer, or employee, or a member of his or her family, receives improper personal benefits as a result of his or her position with the Company. Loans to, or guarantees of obligations of, employees and their family members may create conflicts of interest.

84.    In a section titled, "Corporate Opportunities[,]" the Code of Conduct provides that

Company funds may not be used to secure special treatment for the Company, stating the

following:

Directors, officers, and employees are prohibited from taking for themselves personally or directing to a third party any opportunity that is discovered through the use of corporate property, information, or position without the consent of the Board. No director, officer, or employee may use corporate property, information, or position for improper personal gain, and no director, officer, or employee may compete with the Company directly or indirectly. Directors, officers, and

22

employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

85.     In a section titled, "Competition and Fair Dealing," the Code of Conduct provides

the following, in relevant part:

The Company seeks to compete in a fair and honest manner. The Company seeks competitive advantages through superior performance rather than through unethical or illegal business practices. Stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.  Each director, officer,  and employee should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, service providers, competitors, and employees. No director, officer, or employee should take unfair advantage of anyone relating to the Company's business or operations through manipulation, concealment, or abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

To maintain the Company's valuable reputation, compliance with the Company's quality processes and safety requirements is essential. In the context of ethics, quality requires that the Company's products and services meet reasonable customer expectations. All inspection and testing documents must be handled in accordance with all applicable regulations.

The purpose of business entertainment and gifts in a commercial setting is to create good will and sound working relationships, not to gain unfair advantage with customers. No gift or entertainment should ever be offered, given, provided, or accepted by a director, officer, or employee, family member of a director, officer, or employee, or agent relating to the individual's position with the Company unless it (i) is not a cash gift, (ii) is consistent with customary business practices, (iii) is not excessive in value, (iv) cannot be construed as a bribe or payoff, and (v) does not violate any laws or regulations. A director or officer of the Company should discuss with the Company's chief executive officer or chief financial officer; and an employee should discuss with his or her supervisor, manager or other appropriate Company personnel, any gifts or proposed gifts that the individual is not certain are appropriate.

86.     In a section titled "Record Keeping," the Code of Conduct states the following, in

relevant part:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions.

Many officers and employees regularly use business expense accounts, which must be documented and recorded accurately. If an officer or employee is not sure whether a certain expense is legitimate, the employee should ask his or her supervisor or the Company's controller. Rules and guidelines are available from the Company's accounting department.

All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Business records and communications often become public, and the Company and its officers and employees in their capacity with the Company should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos, and formal reports. The Company's records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, directors, officers, and employees should consult with the Company's chief financial officer or legal counsel before taking any action because it is critical that any impropriety or possible appearance of impropriety be avoided.

87.    In a section titled, "Protection and Proper Use of Company Assets," the Code of Conduct states the following:

All directors, officers, and employees should endeavor to protect the Company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud or theft should be immediately reported for investigation. Company assets should be used for legitimate business purposes and should not be used for non-Company business. The obligation to protect the Company's assets includes its proprietary information. Proprietary information includes intellectual property, such as trade secrets, patents, trademarks, and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information, and any unpublished financial data and reports. Unauthorized use or distribution of this information would violate Company policy. It could also be illegal and result in civil or even criminal penalties.

88.    In a section titled, "Reporting any Illegal or Unethical Behavior," the Code of Conduct states the following:

Directors and officers are encouraged to talk to the Company's chief executive officer, the chief financial officer, or legal counsel, and employees are encouraged

to talk to supervisors, managers, or other appropriate personnel, when in doubt about the best course of action in a particular situation. Directors, officers, and employees should report any observed illegal or unethical behavior and any perceived violations of laws, rules, regulations, or this Code to appropriate personnel. It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith. Directors, officers, and employees are expected to cooperate in internal investigations of misconduct.

The Company maintains a Whistleblower Policy, for (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (ii) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

89.     In a section titled, "Enforcement," the Code of Conduct states the following:

The Board shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code and to these additional procedures; may include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board); and termination of the individual's employment or position. In determining the appropriate action in a particular case, the Board, or such designee, shall take into account all relevant information, including (i) the nature and severity of the violation, (ii) whether the violation was a single occurrence or repeated occurrences, (iii) whether the violation appears to have been intentional or inadvertent, (iv) whether the individual in question had been advised prior to the violation as to the proper course of action, and (v) whether or not the individual in question had committed other violations in the past.

90.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to allow the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to report the same. Moreover, in violation of the Code of Conduct, the Defendants failed to maintain the accuracy of Company records and reports, comply with laws and

25

regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Next Bridge's History*

91.    Next Bridge was incorporated in Nevada on August 31, 2021 as OilCo Holdings, Inc. At that time, Next Bridge was a wholly owned subsidiary of Meta Materials. On June 30, 2022, the Company changed its named from OilCo Holdings, Inc. to Next Bridge.

92.    Today, Next Bridge is based in Fort Worth, Texas and is an independent public reporting energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Next Bridge's primary focus has been the Orogrande Project, which consists of the development of oil and gas interests across 134,000 contiguous gross acres the Company owns in the Orogrande Basin located in Hudspeth County, Texas. Next Bridge also focuses on the Hazel Project which consists of minor drilling interests located in the eastern portion of the Midland Basin in Texas, and the Oklahoma Wells.

93.    In 1984, Defendant McCabe founded MPC, the McCabe Petroleum Corporation. He subsequently also founded the Hudspeth, another oil company.

94.    In 2010, Torchlight began oil and gas drilling operations. Torchlight described itself as "focus[ed] on drilling and working interest programs within the United States that have a short window of payback, a high internal rate of return and proven and bookable reserves. We currently have only one interest in an oil and gas project, the Marcelina Creek Field Development . . .. We anticipate being involved in multiple other oil and gas projects moving forward, pending adequate funding."

95.     On August 7, 2014, Torchlight, MPC, and Hudspeth entered into a Purchase Agreement that covers drilling leases for the 134,000 contiguous gross acres of the Orogrande Project. Defendant McCabe also owns a controlling interest in Wolfbone, which owns certain properties in the Orogrande Project. Additionally, Defendant McCabe owns a controlling interest in Magdalena, an entity that holds a 4.5% overriding royalty interest in the acreage of the Orogrande Project.

96.     Between May and August of 2020, Torchlight engaged in discussions with five businesses that were interested in pursuing a reverse merger. All five merger discussions were unsuccessful because of Torchlight's disposition or sale of its oil and gas assets before any merger or because of disagreements regarding the proper valuation of the merging entity.

97.     In early September 2020, Torchlight's investor relations representative, who had been tasked with facilitating Torchlight's merger discussions, initiated a virtual meeting between Torchlight's management and Palikaras, who was the President and CEO of Metamaterial, a privately held Canadian corporation headquartered in Nova Scotia, Canada.

98.     On September 4, 2020, Defendant McCabe, Torchlight's Chairman of the Board of Directors, and Defendant Brda, Torchlight's CEO at the time, met virtually with Palikaras. After the meeting, the parties signed a confidentiality agreement and proceeded to negotiate the structure of a merger between Torchlight and Metamaterial.

99.     However, the issues that scuttled Torchlight's five previous merger discussions haunted Torchlight in the merger discussions with Metamaterial as well. In particular, problems arose pertaining to "[Metamaterial's] desire that Torchlight divest the O&G Assets [oil and gas assets], the anticipated impact of that divestiture on Torchlight's market capitalization prior to closing the transaction (which the parties were using to determine Torchlight's valuation), the

27

appropriate method for valuing the O&G Assets, and how the value of the O&G Assets should be allocated between each party's legacy stockholder base."

100.    To resolve this issue, Metamaterial suggested that the parties structure the merger so that all the O&G Assets would be allocated to legacy Torchlight stockholders, and on that basis agree on the pro forma ownership percentage of the combined company (Meta Materials) that would be allocated to each of Metamaterial's stockholder base and Torchlight's stockholder base. Torchlight and Metamaterials eventually agreed that Torchlight's legacy stockholder base would own approximately 75% of Meta Materials and Metamaterial's legacy stockholder base would own approximately 25% of Meta Materials.

101.    On December 14, 2020, Torchlight[3] and its subsidiaries, Exchangeco and Callco, both Canadian corporations, entered into Arrangement Agreement with Metamaterial to acquire all of the outstanding common shares of Metamaterial by way of the Arrangement under the Ontario Business Corporations Act, on and subject to the terms and conditions of the Arrangement Agreement.

102.    On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed and the combined company was named Meta Materials. Meta Materials stock began trading on the NASDAQ.

---

[3] Previously, Meta Materials was in the energy business, particularly when Meta Materials was known as Torchlight. However, since at least June 2023, Meta Materials has revised its business model by largely abandoning the energy business and instead focused on becoming a "advanced materials and nanotechnology company" that develops technology to "enable global brands to develop new products to improve performance for customers in aerospace and defense, consumer electronics, 5G communications, batteries, authentication, automotive and clean energy" including applications relating to "authentication, wide area motion imagery, battery materials, and transparent conductive films." March 28, 2024 Meta Materials Form 10-K Annual Report for the fiscal year ending December 31, 2023.

103.    Under the Arrangement, Meta Materials declared a stock dividend, on a one-for-one basis, of shares of Meta Materials Series A Preferred Stock to holders of legacy Torchlight's common stock as of June 24, 2021. By dint of the Arrangement, the holders of Meta Materials Series A Preferred Stock were entitled to receive certain stock dividends based on the net proceeds of the sale of any O&G Assets and were also entitled to possibly receive a pro rata dividend of equity in a spin-off entity to which Meta Materials would transfer any remaining O&G Assets.

104.    In other words, because of the merger, Meta Materials owned several oil and gas exploration subsidiary companies that were previously owned by Torchlight. Pursuant to the Arrangement, former Torchlight shareholders who now owned Meta Materials Series A Preferred Stock were given the right to receive either: (a) proceeds from the sale of O&G Assets should Meta Materials sell any of the subsidiaries themselves or the O&G Assets owned by the subsidiaries, or (b) equity interest in any separate spin-off entity that Meta Materials created in the event Meta Materials did not sell off certain O&G Assets owned by certain subsidiaries by a specific date.

105.    As such, Plaintiff held Meta Materials Series A Preferred Stock. This Verified Stockholder Derivative Complaint arises from the Board of Directors of Meta Materials failing to timely sell off the O&G Assets so that option (b)—creating separate entities, spinning them off, and providing Meta Materials Series A Preferred Stockholders equity interests in those spun-off entities—was the only option for the Board of Directors of Meta Materials.

106.    On November 18, 2022, Next Bridge filed the Registration Statement with the SEC. Defendants Rice and Cook signed the Registration Statement. The Registration Statement became effective that same day.

107.    Slightly less than one month later, on December 14, 2022, Meta Materials completed the Spin-Off by distributing 100% of the outstanding shares of capital stock of Next

Bridge—165,472,241 shares of Next Bridge common stock—to Meta Materials Series A Preferred Stockholders, thereby separating Next Bridge from Meta Materials. After that date, Next Bridge was an independent public reporting company.

108.    Before the Spin-Off, Defendant McCabe beneficially owned 19,605,348 shares of Meta Materials Series A Preferred Stock, as these shares were converted pursuant to the Arrangement Agreement when Torchlight merged with Metamaterials.[4] Through the Spin-Off, Defendant McCabe's 19,605,348 shares of Meta Materials Series A Preferred Stock should have been converted into 19,605,348 shares of Next Bridge common stock. Therefore, after the Spin-Off, Defendant McCabe would have beneficially owned 19,605,348 shares of Next Bridge common stock, or 11.84% of all Next Bridge's outstanding common stock.

109.    However, immediately before the Spin-Off, Defendant McCabe unloaded *approximately 6.7 million shares[5]* of his Meta Materials Series A Preferred Stock holdings for *personal profits between $19.6 million and $78.9 million*.[6]

110.    Before the Spin-Off, Defendant Brda beneficially owned 2,318,322 shares of Meta Materials Series A Preferred Stock, as these shares were converted pursuant to the Arrangement Agreement when Torchlight merged with Metamaterials. Through the Spin-Off, Defendant Brda's 2,318,222 shares of Meta Materials Series A Preferred Stock should have been converted into

---

[4] Before Torchlight's merger with Metamaterials, Defendant McCabe beneficially owned 19,605,348 shares of Torchlight common stock, or about 13.49% of all Torchlight's outstanding common stock. Defendant McCabe served as the Chairman of the Board of Directors of Torchlight from October 2016 until the merger with Metamaterials.

[5] All emphasis herein is added unless stated otherwise.

[6] Meta Materials Series A Preferred Stock traded under the ticker "MMTLP" on the NASDAQ over-the-counter markets from October 2021 until the Spin-Off in December 2022. During the month before the Spin-Off, Meta Materials Series A Preferred Stock traded at prices between $2.90 per share and $11.65 per share, for an average price of $8.15 per share.

2,318,222 shares of Next Bridge common stock. Therefore, after the Spin-Off, Defendant Brda would have beneficially owned 2,318,222 shares of Next Bridge common stock.

111.    However, immediately before the Spin-Off, Defendant Brda unloaded **approximately 388,000 shares** of his Meta Materials Series A Preferred Stock holdings for **personal profits between $300 thousand and 3 million.**

112.    After the Spin-Off, Defendant DuBose became Next Bridge's CEO and Chairman of the Board, Defendant DeWoody became the President and a Company director, Defendant Hawkins became CFO, Defendant Oelkers became COO, and Defendants Cook, Pitts, and Whitley became Company directors.

113.    Meta Materials, the former parent company of Next Bridge, continuously monitored the value of the O&G Assets before the Spin-Off.

114.    For example, before the spin-off was completed, Meta Materials loaned Next Bridge an aggregate of $20 million excluding interest, for the purposes of drilling activity and compliance with Next Bridge's oil and gas lease obligations. Approximately $15 million of the loan was collateralized by Defendant McCabe's interest in the Orogrande Project.

115.    Yet, the Registration Statement contained astronomically high valuations of the worth of Next Bridge's O&G Assets. In particular, the Registration Statement represented that Next Bridge's O&G Assets were worth $45.6 million as of December 31, 2021, $46.7 million as of March 31, 2022, and $47.3 million as of September 30, 2022.

### *History of Next Bridge's Oil and Gas Assets*

116.    Next Bridge owns three O&G Assets: (1) the Orogrande Project, (2) the Hazel Project, and (3) the Oklahoma Wells. The Orande Project initially covered 172,000 acres in Hudspeth County, Texas before being reduced to 134,000 acres after certain lease agreements.

Next Bridge leased the land from University Lands, and according to the lease agreement, Next Bridge was required to drill five wells per year for the years 2021, 2022, and 2023. Next Bridge had to extend the term for the 2022 year in order to fulfil its drilling obligations under the lease agreement.

117.    The Orogrande Project sits on the western edge of the Permian Basin far away from the Delaware, Central, and Midland Basins. As such, the location of the Orogrande Project makes drilling more expensive due to there being little infrastructure and oilfield providers nearby. The nearest gas pipeline from the Orogrande Project is approximately 6.6 miles away.

118.    Trail Mountain Inc. ("Trail Mountain") first acquired the leasing rights to the Orogrande Project in June 1993. During its lease, Trail Mountain drilled several wells, but Trail Mountain let its leasing rights lapse in 2003 after the initial term expired due to the Orogrande Project lacking production potential and having unfavorable economics.

119.    In April 2013, Arabella Petroleum Company, LLC acquired the rights to the Orogrande Project. During this time, University lands would publish a "Call For Nominations" in which oil companies can bid on plots of land, but no oil companies bid for a lease on the available land around the Orogrande Project due to it being known was unproductive and lacking commercial viability.

120.    Torchlight then acquired the Orogrande Project in August and September 2014 and quickly began looking for a "wildcatting" partner. Wildcatting is when one drills exploratory oil wells in unproven or unknown territory, meaning that the company plans to drill in places where oil or gas has not been previously discovered. Wildcatting is considered high risk-high reward because it is difficult to know when one is supposed to cut their losses based off poor drillings results. Torchlight entered into a "Farmout Agreement" with Founders Oil & Gas LLC

32

("Founders") in September 2015, whereby Founders provided funding for drilling operations in exchange for a 50% interest in the assets generated by the Orogrande Project. However, in 2017, Founders terminated the agreement.

121. The Orogrande Project consists of three main wells, the University Cactus #A35 ("UC35"), University Founders #A25 ("UF25"), and University Hueco #A39 ("UH39"). Torchlight had reopened UC35 after Trail Mountain previously shut-in, and by March 2020, UC35 had only produced 15 barrels of oil per day and 110 MCF of gas per day. In September 2020, Scott Kimbrough of University Lands confirmed that they had shut-in UC35 due to it producing only a "skim of oil (not a barrel & none sold) & very little gas." In a later email by Defendant McCabe to Defendant Oelkers, Defendant McCabe confirmed that UF25 and UH39 only produced "fresh water" and were a "nightmare to drill."

122. On April 4, 2016, a subsidiary of Torchlight, TEI, acquired from MPC a 66.66% working interest in approximately 12,000 acres in the Midland Basin for the Hazel Project.

123. On August 13, 2020, TEI and another subsidiary of Torchlight, Torchlight Hazel, LLC, entered into an option agreement with MHP, an entity that Defendant DuBose controls through his role as CEO of MHP's General Partner, Masterson Hazel Management, LLC, and MPC. Under the option agreement, MHP was obligated to satisfy certain drilling obligations on the Hazel Project. Further, under the terms of the option agreement (which was amended in September 2020), MHP had the option to purchase the entire Hazel Project no later than May 31, 2021.

124. The Hazel Project consists of 12,000 acres in the Midland Basin. There were two producing wells on the Hazel Project, the Flying B Ranch #3H (the "FB3") and Flying B Ranch #4H (the "FB4") from the Wolfcamp formation. The initial oil production from FB3 reached 8,319

Bbl per month and 31,613 Bbl per month of water. FB 4 had an initial gross monthly production rate of 4,200 Bbl. But, after taking into account Next Bridge's reimbursement obligations to MHP for drilling costs, FB3 and FB4 had no proved reserves or proved developed nonproducing reserves. As a result, Next Bridge did not receive any revenue from FB3 and FB4 because after deducing expenses for the production of the oil, MHP was to receive all revenues until FB3 and FB4's estimated depletion. From December 31, 2020 to December 31, 2022, Next Bridge's assets in the Hazer Project produced zero barrels of oil equivalent for each year.

### *Torchlight Touts the Value of the O&G Assets*

125.    Torchlight first touted the value of its O&G Assets on April 11, 2019, when it issued a press release titled "Torchlight Announces New Field Discovery 3rd Party Reserve Estimate of 3.678 Billion Barrells in Recovery Potential From Unconventional Zones" (the "Torchlight April 2019 Press Release"). The Torchlight April 2019 Press Release stated, in relevant part:

> PLANO, TX / ACCESSWIRE / April 11, 2019 / Torchlight Energy Resources, Inc. (NASDAQ: TRCH) ("Torchlight" or the "Company"), today announced that the Company has received the final petrophysical report relating to its Orogrande Basin Project. The report will be utilized in the delivery of due diligence materials to industry suitors for potential M&A discussions with Torchlight. The final report, prepared by Stimulation Petrophysics Consulting out of Denver, outlines the potential recoverable reserves from the unconventional zones on Torchlight's 134,000 acres in the Orogrande Basin. The Orogrande is the western most subbasin of the Greater Permian Basin.

> The extensive report outlines a range of recoverable values based on standardized recovery factors. Described in Potential Barrels.

> Low Case 2.321 MMBOe Recovery Factor (7%)

> Mean Case 3.678 MMBOe Recovery Factor (11%)

> Best Case 4.975 MMBOe Recovery Factor (15%)

> The following updates were previously disclosed:

• Additional potential of up to 20,000 acres of multiple conventional structures, based upon seismic, gravity, and magnetics

• Potential for up to 10 distinct unconventional and conventional hydrocarbon pay zones throughout the Orogrande Project at varying depths.

"We are pleased to provide this substantive update to shareholders and the broader oil and gas industry," stated John Brda, Torchlight's CEO. "Torchlight's board of directors and management feel that the third-party evaluation and resulting estimate of 3.7 billion barrels of potential recoverable oil at a 11% is a significant revelation. Although the cost to acquire the voluminous amount of science needed for this 3rd party evaluation was quite significant, we are obviously very pleased with the end results. It is unique to find a new basin predominately owned by one exploration company and with agreeable lease terms such as those we have with University Lands. As we enter and continue discussions with suitors, Torchlight will better define the current market value for one of the largest virgin onshore oil and gas basin discoveries in the United States in recent history. We look forward to reporting the impact of such value to our shareholder's ownership."

126.    On March 3, 2020, Torchlight held an investor presentation (the "Torchlight March 2020 Investor Presentation"), in which Torchlight continued to overstate the value of Torchlight's O&G Assets. Specifically, the Torchlight March 2020 Investor Presentation contained the following slide:



127.    On September 2, 2020, Torchlight held an investor conference in which they continued to tout the value of Torchlight's O&G Assets (the "Torchlight September 2020 Investor Conference"). During the Torchlight September 2020 Investor Conference, Defendant Brda, described Torchlight as a:

> [P]ure Permian player in that our 3 properties are in Midland Basin, the Delaware Basin and Orogrande Basin . . . . We are in control of a world-class project that is Orogrande project. It's 134,000 acres with derisked upside. We have independently verified from simulation petrophysics to have 3.7 billion barrels of recoverable reserves in addition to between 5 and 8 Tcf of gas.

128.    On December 11, 2022, Defendant Brda posted on X (formerly Twitter) in which he further represented the value of Torchlight's O&G Assets:



**The Materially False and Misleading Registration Statement**

36

129.     The Registration Statement contained astronomically high valuations of the worth of Next Bridge's O&G Assets. In particular, the Registration Statement represented that Next Bridge's O&G Assets were worth $45.6 million as of December 31, 2021, $46.7 million as of March 31, 2022, and $47.3 million as of September 30, 2022.

130.     In regard to Next Bridge's Audit Committee, the Registration Statement stated, in relevant part:

Upon their appointment to the Board, the members of the Audit Committee will consist of Kristin Whitley, as the chairperson, Mia Pitts and Robert L. Cook, each of whom meet the independence requirements set forth in Rule 10A-3 under the Exchange Act and our Audit Committee Charter. ***Each member of the Audit Committee is financially literate, and Ms. Whitley has accounting and related financial management expertise and satisfies the criteria to be an "audit committee financial expert" under the rules and regulations of the SEC, as those qualifications are interpreted by our Board in its business judgment.***

The functions of the Audit Committee include:

• ***oversee the quality and integrity of our financial statements, accounting practices and financial information we provide to the SEC or the public;***

• ***review our annual and interim financial statements, the report of our independent registered public accounting firm on our annual financial statements, Management's Report on Internal Control over Financial Reporting and the disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations;***

• select and appoint an independent registered public accounting firm;

• pre-approve all services to be provided to us by our independent registered public accounting firm;

• review related party transactions;

• ***review with our independent registered public accounting firm and our management the accounting firm's significant findings and recommendations upon the completion of the annual financial audit and quarterly reviews;***

• review and evaluate the qualification, performance, fees and independence of our registered public accounting firm;

37

• *meet with our independent registered public accounting firm and our management regarding our internal controls, critical accounting policies and practices and other matters;*

• discuss with our independent registered public accounting firm and our management earnings releases prior to their issuance;

• *oversee our internal audit function;* and

• *oversee our compliance program, response to regulatory actions involving financial, accounting and internal control matters, internal controls and risk management policies.*

131.    In regard to the "Report of the Independent Registered Public Accounting Firm,"

the Registration Statement stated, in relevant part:

We have audited the accompanying consolidated balance sheets of Next Bridge Hydrocarbons, Inc. as of December 31, 2021 and 2020, the related statements of operations, stockholders' equity (deficit), and cash flows for the years then ended, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, *the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.*

132.    The Registration Statement also stated that the financial statements contained in the

Registration Statement fairly represented the financial position of the Company. Specifically, the

Registration Statement stated, in relevant part:

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

. . .

*Basis of presentation* – The financial statements are presented on a consolidated basis and include all of the accounts of Next Bridge Hydrocarbons, Inc. and its wholly owned subsidiaries, Torchlight Energy, Inc., Hudspeth Operating, LLC, Hudspeth Oil Corporation, and Torchlight Hazel LLC. All significant intercompany balances and transactions have been eliminated.

These interim financial statements are unaudited and have been prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. Certain disclosures have been condensed or omitted from these financial statements. Accordingly, they do not include all the information and notes required by accounting principles generally accepted in the United States of America ("GAAP") for complete consolidated financial statements, and should be read in conjunction with the audited consolidated financial statements and notes thereto included herein for the year ended December 31, 2021.

*In the opinion of management, the accompanying unaudited financial condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary to fairly present the financial position as of, and the results of operations for, all periods presented.* In preparing the accompanying financial statements, management has made certain estimates and assumptions that affect reported amounts in the condensed financial statements and disclosures of contingencies. Actual results may differ from those estimates. The results for interim periods are not necessarily indicative of annual results.

133.    The Registration Statement also described Next Bridge's Option Agreement with

MHP for the Hazel Project, stating, in relevant part:

On August 13, 2020, our subsidiaries Torchlight Energy, Inc. and Torchlight Hazel, LLC (collectively, "Torchlight") entered into an option agreement (the "Option Agreement") with Masterson Hazel Partners, LP ("MHP") and McCabe Petroleum Corporation. *Under the agreement, MHP was obligated to drill and complete, or cause to be drilled and completed, at its sole cost and expense, a new lateral well (the "Well") on our Hazel Project, sufficient to satisfy Torchlight's continuous development obligations on the southern half of the prospect no later than September 30, 2020*. MHP has satisfied this drilling obligation. MHP paid to Torchlight $1,000 as an option fee at the time of execution of the Option Agreement. *MHP is entitled to receive, as its sole recourse for the recoupment of drilling costs, the revenue from production of the Well attributable to Torchlight's interest until such time as it has recovered its reasonable costs and expenses for drilling, completing, and operating the well*.

In exchange for MHP satisfying the above drilling obligations, Torchlight granted to MHP the exclusive right and option to perform operations, at MHP's sole cost and expense, on the Hazel Project sufficient to satisfy Torchlight's continuous development obligations on the northern half of the prospect. Because MHP exercised this drilling option and satisfied the continuous development obligations on the northern half of the prospect, under the terms of the Option Agreement (as amended in September 2020) MHP had the option to purchase the entire Hazel Project no later than May 31, 2021. Such purchase would be under the terms of a form of Purchase and Sale Agreement included as an exhibit to the Option Agreement, at an aggregate purchase price of $12,690,704 for approximately 9,762

39

net mineral acres, and not less than 74% net revenue interest (approximately $1,300 per net mineral acre). MHP declined to exercise the Option in 2021.

134. The above statements in ¶¶ 129-133 were materially false and misleading and failed to disclose, inter alia, that:, *inter alia*, that: (1) Next Bridge's O&G Assets which the Company received from Meta Materials in the Spin-Off were not worth tens of millions of dollars but were actually substantively worthless; (2) Next Bridge's predecessor parent company, Meta Materials, enjoyed full access to relevant valuation information for the O&G Assets and had continuously monitored the value of the O&G Assets yet failed to disclose that the O&G Assets were worthless; (3) Defendant DuBose was materially interested in the Spin-Off through his role as CEO of Masterson Hazel Management, LLC, the General Partner of MHP; (4) the internal controls of Meta Materials and Next Bridge were materially inadequate and ineffective; (5) as a result, Next Bridge was not nearly as valuable as the Individual Defendants claimed Next Bridge to be; and (6) as a further result, Meta Materials Series A Preferred Stockholders were receiving a worthless company in the Spin-Off. As a result of the foregoing, Next Bridge's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*March 23, 2023 Meta Materials Form 10-K*

135. On March 23, 2023, Meta Materials filed its Form 10-K for the 2022 fiscal year with the SEC (the "2022 MM Form 10-K"). The 2022 MM Form 10-K revealed that Meta Materials had impaired its loan to Next Bridge, finding that the value of the O&G Assets as of the date of the spin-off was "not substantive." Specifically, the 2022 MM Form 10-K stated, in relevant part:

> Notes receivable consists of an amount due from Next Bridge, which was previously a wholly-owned subsidiary of Meta, until the completion of the spin-off transaction on December 14, 2022. One note is partially secured by a combination

of Meta's common shares and an interest in the Orogrande Project Property. ***The note receivables have been recognized at their fair value, as of December 14, 2022, subsequent to the deconsolidation of Next Bridge from our consolidated financial results.***

We have assessed the fair value of the notes receivable on the deconsolidation date in accordance with ASC 820, Fair Value Measurement. In particular, we assessed the likelihood of our ability to receive the aggregate amount of the $24.2 million of notes receivable and determined that except for the security interest in our shares held by the Pledgor for the secured loan, ***the other collateral is not substantive and therefore should not serve as the basis for concluding that that loan is well secured and collateralized***; the other loan is unsecured. As a result, we reserved $22 million of the Next Bridge note receivables, resulting in $2.2 million being shown on our balance sheet as of December 31, 2022.

136.    In spite of Meta Materials impairment of its loan to the Company, Next Bridge's officers and directors continued to obfuscate the truth surrounding the value of the O&G Assets.

***March 31, 2023 Next Bridge Form 10-K***

137.    For example, on March 31, 2023, Next Bridge filed the 2022 Next Bridge Form 10-K. The 2022 Next Bridge Form 10-K was signed by Defendants DuBose, DeWoody, Hawkins, Cook, Pitts, and Whitley. The 2022 Next Bridge Form 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants DuBose and Hawkins attesting to the accuracy of the 2022 Next Bridge Form 10-K and that the 2022 Next Bridge Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

138.    The 2022 Next Bridge Form 10-K stated that the value of Next Bridge's O&G Assets had increased from $45,663,470 in 2021 to $79,695,928 in 2022, representing a nearly 70% increase in value.

41

139.    The above statements in ¶¶ 137-138 were materially false and misleading and failed to disclose, inter alia, that:, *inter alia*, that: (1) Next Bridge's O&G Assets which the Company received from Meta Materials in the Spin-Off were not worth tens of millions of dollars but were actually substantively worthless; (2) Next Bridge's predecessor parent company, Meta Materials, enjoyed full access to relevant valuation information for the O&G Assets and had continuously monitored the value of the O&G Assets yet failed to disclose that the O&G Assets were worthless; (3) Defendant DuBose was materially interested in the Spin-Off through his role as CEO of Masterson Hazel Management, LLC, the General Partner of MHP; (4) the internal controls of Meta Materials and Next Bridge were materially inadequate and ineffective; (5) as a result, Next Bridge was not nearly as valuable as the Individual Defendants claimed Next Bridge to be; and (6) as a further result, Meta Materials Series A Preferred Stockholders were receiving a worthless company in the Spin-Off. As a result of the foregoing, Next Bridge's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

***July 17, 2024 Form 10-K***

140.    The truth fully emerged on July 17, 2024, the Company filed its Form 10-K with the SEC for the 2023 fiscal year (the "2023 Next Bridge Form 10-K"). The 2023 Next Bridge Form 10-K revealed that the Company was restating some of its previously reported financial results. Specifically, the 2023 Form Next Bridge 10-K restated the value of the O&G Assets from $79,695,928 as of December 31, 2022, to $0 as of December 31, 2022.

**Subsequent Developments**

141.    On August 9, 2024, Meta Materials filed a Current Report on Form 8-K announcing that the Company had filed for Chapter 7 Bankruptcy (the "Mets Materials Bankruptcy Form 8-

K"). The Meta Materials Bankruptcy Form 8-K further revealed that Meta Materials had laid off its remaining employees, and every director had tendered their resignation.

## DAMAGES TO NEXT BRIDGE

142.    As a direct and proximate result of the Individual Defendants' conduct, Next Bridge will lose and expend many millions of dollars.

143.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the false and misleading statements and any other misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

146.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

147.    As a direct and proximate result of the Individual Defendants' conduct, Next Bridge has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act.

## DERIVATIVE ALLEGATIONS

148.    Plaintiff brings this action derivatively and for the benefit of Next Bridge to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as directors and/or officers of Next Bridge, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof.

149.    Next Bridge is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150.    Plaintiff is and has been since before the beginning of the Relevant Period, a stockholder of Next Bridge. Plaintiff will adequately and fairly represent the interests of Next Bridge in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

151.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

152.    A pre-suit demand on the Board of Next Bridge is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following three individuals: Defendants McCabe and Cook (the "Director Defendants") and non-defendant director Edward Pocock III. Plaintiff needs only to allege demand futility as to two of the three Director Defendants that were on the Board at the time of the filing of this complaint.

44

153. Demand is excused as to both of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

154. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

155. Additional reasons that demand on Defendant McCabe is futile follow. Defendant McCabe has served as the Chairman of the Board since June 21, 2023 and as President and CEO of Next Bridge since January 15, 2024. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant McCabe with his principal occupation for which he receives handsome compensation. As CEO of the Company, Defendant McCabe is ultimately responsible for the Company's engagement in issuing all the false and misleading statements and omissions that were made during the Relevant Period. As the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets.

Moreover, Defendant McCabe personally signed the Registration Statement which contained false and misleading statements relating to the valuations of the Company's O&G Assets—assets he has leased, owned, and controlled through his network of entities including but not limited to MPC, Hudspeth, and Wolfbone—especially pertaining to the Orogrande Project and the Hazel Project. As he personally facilitated the merger of Torchlight and Metamaterial before the Relevant Period, he would have had detailed knowledge of the true valuations of the O&G Assets before and during the Relevant Period.

156.    Additionally, Defendant McCabe is the largest shareholder of the Company and personally materially benefited from the Spin-Off of Meta Materials. Immediately before the Spin-Off, Defendant McCabe unloaded approximately 6.7 million shares of his Meta Materials Series A Preferred Stock holdings for personal profits between $19.6 million and $78.9 million. Further, Defendant McCabe is a defendant in the Securities Class Action. Likewise, he personally owns and controls many of Next Bridge's subsidiaries and caused and still causes Next Bridge to enter into a variety of related party transactions through purchase agreements and other contracts with those subsidiaries—including Hudspeth, MPC, TEI, and Magdalena. For these reasons, Defendant McCabe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Cook is futile follow. Defendant Cook has served as a Company director since the Company announced it was spinning off from Meta Materials on June 30, 2022. As a member of the Board, Defendant Cook serves on the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded

his duty to protect corporate assets. Moreover, Defendant Cook was named as a defendant in the Securities Class Action. Additionally, Defendant Cook signed the Registration Statement and thus personally made the false and misleading statements contained therein. Defendant Cook also signed the false and misleading 2022 Next Bridge Form 10-K. For these reasons, Defendant Cook breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on the Board is futile follow.

159.    Defendants Cook served as member of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendant Cook failed to adequately review and discuss the Company's Forms 10-K; failed to adequately exercise their risk management and risk assessment functions, and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendant Cook further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

160.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws,

rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

161. Next Bridge has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Next Bridge any part of the damages Next Bridge suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

162. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As both of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

163. The acts complained of herein constitute violations of fiduciary duties owed by Next Bridge's officers and directors, and these acts are incapable of ratification.

164. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Next Bridge. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Next Bridge, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

165. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Next Bridge to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

166. Thus, for all of the reasons set forth above, both of the Director Defendants cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

167. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Next Bridge's business and affairs.

169. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

170. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.

Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Next Bridge.

171. In breach of their fiduciary duties owed to Next Bridge, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Next Bridge's O&G Assets which the Company received from Meta Materials in the Spin-Off were not worth tens of millions of dollars but were actually substantively worthless; (2) Next Bridge's predecessor parent company, Meta Materials, enjoyed full access to relevant valuation information for the O&G Assets and had continuously monitored the value of the O&G Assets yet failed to disclose that the O&G Assets were worthless; (3) Defendant DuBose was materially interested in the Spin-Off through his role as CEO of Masterson Hazel Management, LLC, the General Partner of MHP; (4) the internal controls of Meta Materials and Next Bridge were materially inadequate and ineffective; (5) as a result, Next Bridge was not nearly as valuable as the Individual Defendants claimed Next Bridge to be; and (6) as a further result, Meta Materials Series A Preferred Stockholders were receiving a worthless company in the Spin-Off.

172. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

173. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

174. Also, in breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

175.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Next Bridge's stockholders and benefitting third parties.

176.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Next Bridge has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

178.    Plaintiff on behalf of Next Bridge has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Unjust Enrichment**

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Next Bridge.

181.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Next Bridge that was tied to the

51

performance or artificially inflated valuation of Next Bridge or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

182.    Plaintiff, as a shareholder and a representative of Next Bridge, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

183.    Plaintiff, on behalf of Next Bridge, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

184.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Next Bridge, for which they are legally responsible.

186.    As a direct and proximate result of the Individual Defendants' abuse of control, Next Bridge has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Next Bridge has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187.    Plaintiff on behalf of Next Bridge has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

188.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189. By its actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Next Bridge in a manner consistent with the operations of a limited Company.

190. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Next Bridge has sustained and will continue to sustain significant damages.

191. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

192. Plaintiff on behalf of Next Bridge has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. As a result of the foregoing, and by failing to properly consider the interests of the Company and its stockholders, the Individual Defendants have caused Next Bridge to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

195. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

196. Plaintiff on behalf of Next Bridge has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Brda, Cook, McCabe, DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley for Contribution Under Section 11(f) of the Securities Act

197. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198. Next Bridge and Defendants Brda, Cook, McCabe, DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 11, 15, and 12(a)(2) of the Securities Act.[7] If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Brda's, Cook's, McCabe's, DuBose's, DeWoody's, Hawkins', Oelkers', Pitts', and Whitley's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

199. Defendants Brda, Cook, McCabe, DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley, because of their positions of control and authority as officers and/or directors of the Company were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

200. Federal law provides Next Bridge with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

201. Defendants Brda, Cook, McCabe, DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley, because of their positions of control and authority as officers and/or directors of Next

---

[7] As previously mentioned, the Court dismissed the Securities Class Action due to the Court's finding that the plaintiffs in the Securities Class Action do not have "statutory coverage" to bring claims under the Securities Act, and not on the merits of the Securities Class Action. The plaintiffs in the Securities Class Action are presently appealing the Court's decision to dismiss the Amended Complaint in the United States Court of Appeals for the Fifth Circuit.

Bridge, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Next Bridge, including the wrongful acts complained of herein and in the Securities Class Action.

202.    Accordingly, Defendants Brda, Cook, McCabe, DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution.

203.    As such, Next Bridge is entitled to receive all appropriate contribution or indemnification from Defendants Brda, Cook, McCabe, DuBose, DeWoody, Hawkins, Oelkers, Pitts, and Whitley.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Next Bridge, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Next Bridge;

(c)    Determining and awarding to Next Bridge the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Next Bridge and the Individual Defendants to take all necessary actions to reform and improve Next Bridge's corporate governance and internal procedures to comply with applicable laws and to protect Next Bridge and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of

55

Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Next Bridge to nominate at least two candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Next Bridge restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

March 17, 2026                                       Respectfully submitted,

                                       **THE BROWN LAW FIRM, P.C.**

                                       */s/ Saadia Hashmi*
                                       Saadia Hashmi (State Bar No.: 24139546)
                                       Timothy Brown
                                       767 Third Avenue, Suite 2501
                                       New York, NY 10017
                                       Telephone: (516) 922-5427
                                       Facsimile: (516) 344-6204
                                       Email: shashmi@thebrownlawfirm.net
                                                tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Peter Bartok, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of March, 2026.

Signed by:

7A168536F01B440...

Peter Bartok